UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
MARIA I. BELEN,                     :   14 Civ. 6898 (PGG) (JCF)
                                    :
            Plaintiff,              :        REPORT AND
                                    :      RECOMMENDATION
     - against -                    :
                                    :
CAROLYN W. COLVIN, Acting           :
Commissioner of Social Security,    :
                                    :
            Defendant.              :
- - - - - - - - - - - - - - - - - -:
TO THE HONORABLE PAUL G. GARDEPHE, U.S.D.J.:

       The plaintiff, Maria Belen, brings this action pursuant to
section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. §
405(g), seeking review of a determination of the Commissioner of
Social Security (the "Commissioner") finding that she is not
entitled to Supplemental Security Income ("SSI") benefits.   The
parties have submitted cross-motions for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure: the
plaintiff seeks remand solely for a calculation of benefits; the
Commissioner believes the case should be remanded for further
administrative proceedings based on a deficiency in the
Administrative Record.   For the reasons set forth below, I
recommend denying both motions but nevertheless remanding the case
to the Commissioner.

Facts

    A.   Procedural History

This action caps a long and complex procedural history, involving two SSI applications, three Administrative Law Judges ("ALJ"s), a series of hearings, denials of benefits and remands, and one decision awarding benefits.

Ms. Belen filed her first SSI application -- which is the application at issue in this action -- on August 27, 2003, alleging a disability onset date of October 1, 2002. (R. at 118-20).[1] The application was denied and, thereafter, the plaintiff appeared pro se at a hearing before ALJ Valerie Bawolek on October 20, 2005. (R. at 49-52, 56, 516-33). Ms. Belen failed to attend a supplemental hearing approximately four months later at which a vocational expert testified. (R. at 509-15). On May 26, 2006, ALJ Bawolek denied Ms. Belen's application, finding that her medically determinable impairments of depression and anxiety, alone or in combination, did not qualify as "severe" under the regulations promulgated pursuant to the Act. (R. at 37-47). The plaintiff subsequently retained counsel and requested review by the Appeals Council. (R. at 36, 108-09).

In November 2006, the Appeals Council remanded the claim. (R.

---

[1] "R." refers to the Administrative Record filed with the Court as part of the Commissioner's answer.

at 114-17).  After a hearing (R. at 469-508), ALJ Kenneth Sheer issued a decision dated October 15, 2007, ruling that Ms. Belen was not disabled based on his findings that she had the residual functional capacity to perform a wide range of light work and that jobs that she could perform existed in significant numbers in the national economy.  (R. at 9-18).  This time, the Appeals Council denied review.  (R. at 3-6).  Ms. Belen filed a new SSI application on November 24, 2008 (which is not included in the Administrative Record) and, two days later, an action in this district seeking review of the Commissioner's decision on her first application.  (R. at 585, 610).  The second SSI application was adjudicated in Ms. Belen's favor; in a decision dated May 26, 2010, she was found to be entitled to benefits as of November 24, 2008.  (R. at 625).

Meanwhile, her district court action proceeded, resulting in a decision by the Honorable Paul G. Gardephe, U.S.D.J., remanding the case to the Commissioner.  Belen v. Astrue, No. 08 Civ. 10303, 2011 WL 2748687 (S.D.N.Y. July 12, 2011).  The Commissioner thereafter remanded the case to an ALJ to conduct further proceedings to determine whether Ms. Belen was disabled for the period from August 27, 2003, to November 23, 2008.[2] (R. at 623-26).

---

[2]  Although Ms. Belen alleged a disability onset date in October 2002 (R. at 118), SSI benefits "can only be granted prospectively"; therefore "the only issue [to be decided] is whether [Ms. Belen] was disabled under the Act as of . . . the date

On July 19, 2012, ALJ Hilton Miller presided over a hearing in which he asked Ms. Belen and her counsel a handful of questions and ordered a consultative examination. (R. at 701-06). After a supplemental hearing in October 2012 (R. at 710-29), ALJ Miller issued a decision on November 21, 2012, finding that Ms. Belen was not disabled during the relevant period (R. at 556-73). The Appeals Council denied review, making ALJ Miller's decision the final decision of the Commissioner. (R. at 534-37).

### B. Personal and Vocational History

Ms. Belen was born on February 21, 1969. (R. at 118). She attended school until the ninth or tenth grade and has not engaged in work that meets the statutory definition of "past relevant work."[3] (R. at 150, 475, 524, 571, 713). She has three children, whom she took care of while they were in school. (R. at 159).

### C. Medical History in the Administrative Record

On March 1, 2003, Ms. Belen visited Urban Health Plan Inc.'s walk-in clinic seeking medication refills and a thyroid check-up.

_____

of [her] application." Dehnert v. Astrue, No. 07 CV 897, 2009 WL 2762168, at *4 (N.D.N.Y Aug. 24, 2009) (collecting cases); 20 C.F.R. § 416.335. Nevertheless, the ALJ is required to consider an applicant's "complete medical history," which includes medical records from the alleged onset date, if that date is less than one year prior to the application date. 20 C.F.R. § 416.912(d)(2).

[3] Past relevant work is work that was done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the individual to learn to do it. 20 C.F.R. § 416.960(b)(1).

She complained that she had felt depressed for the past five months.  Julio Quintanilla, M.D., diagnosed her with headaches and hypothyroidism, consequently refilling her prescription for the thyroid medication Levathyroxine.  (R. at 344).  Approximately one month later, she reported the following psychological symptoms: sleeplessness (which was not relieved by medication), loss of appetite, depression, anxiety, and increased stress.  Ms. Belen was diagnosed with depressive disorder, and provided with a psychiatric referral and a trial of the antidepressant Elavil.  (R. at 341).

Ms. Belen was admitted to the psychiatric department of Bronx Lebanon Hospital Center in May 2003 for outpatient treatment.  She presented with depression, excessive worry, anxiety, and anhedonia.[4]  Psychiatrist Jack Ellenberg, M.D., diagnosed her with major depressive disorder, single episode, on June 25, 2003, and assessed her with a GAF score of 58.[5]  She was prescribed the anti-

---

[4] Anhedonia is the reduced ability to feel pleasure, and is "considered a core feature of major depressive disorder."  Philip Gorwood, Neurobiological Mechanisms of Anhedonia, 10 Dialogues in Clinical Neuroscience 291, 291 (2008), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181880/ (last visited Sept. 17, 2015).

[5] The Global Assessment of Functioning ("GAF") rubric measures a clinician's overall judgment of a patient's level of psychological, social, and occupational functioning on a scale of 1 to 100.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. rev. 2000) ("DSM-IV"); see also Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010).  A GAF score of 51-60 "reflects a finding of '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social,

anxiety medication Vistaril, the anti-psychotic Zyprexa, and the antidepressant Paxil. (R. at 183-93). She was discharged at the end of June because of a change in her insurance. (R. at 188; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Memo.") at 9).[6]

On August 1, 2003, a certified social worker conducted a pre-admission screening interview at South Bronx Mental Health Council. (R. at 204-07). Ms. Belen complained of insomnia, loss of appetite, moodiness, tearfulness, and general malaise, and the social worker noted that she appeared anxious and depressed. (R. at 204, 206). She was diagnosed with major depression, single episode, and assessed a GAF of 60. (R. at 205).

On October 1, 2003, Edward Vadeika, M.D., conducted a consultative examination on Ms. Belen. (R. at 194-95). The plaintiff complained of constant anxiety and depression, difficulty concentrating, forgetfulness, and insomnia. (R. at 194). Dr.

---

occupational, or school function (e.g., few friends, conflicts with peers or co-workers).'" Catrain v. Barnhart, 325 F. Supp. 2d 183, 192 (E.D.N.Y. 2004) (alteration in original) (quoting DSM-IV at 32); see Petrie v. Astrue, 412 F. App'x 401, 406 n.2 (2d Cir. 2011). The Fifth Edition of the Diagnostic and Statistical Manual no longer utilizes GAF scores, see Diagnostic and Statistical Manual of Mental Disorders, at 16 (5th ed. 2013); however, the GAF rubric was in use during the treatment period at issue here.

[6] As the plaintiff notes, these records from Bronx Lebanon are largely illegible; I have therefore been guided by the plaintiff's own decryption, which the defendant has not challenged.

Vadeika found her functioning within normal parameters except that her concentration was "somewhat impaired." (R. at 195). He diagnosed Ms. Belen with depressive disorder and hypothyroidism by history, and gave her a "guarded" prognosis. He noted that she had a "fair ability to comprehend instructions but somewhat less ability for responding appropriately to supervision, co-workers or work pressures." (R. at 195).

Ms. Belen next met with psychiatrist Norland F. Berk, M.D., on October 3, 2003. (R. at 198-201). Upon examination, he noted coherent but irrelevant speech, shyness, inability to concentrate, mood swings, depression, occasional irritability and euphoria, and difficulty in reading comprehension. (R. at 199-200). He diagnosed Ms. Belen with bipolar disorder, hypomanic,[7] assessed her a GAF of 50, and prescribed Paxil, Zyprexa, and the bipolar medication Depakote. (R. at 201). On October 30, 2003, Dr. Berk indicated that her condition had not responded to the treatment regimen, and he extended her rehabilitation program for three months. (R. at 233).

Meanwhile, on October 29, 2003, Carlos A. Gieseken, M.D., a state agency evaluator, conducted a Mental Residual Functional

---

[7] Hypomania is a "less severe form of mania." National Institute of Mental Health, Bipolar Disorder in Adults, http://www.nimh.nih.gov/health/publications/bipolar-disorder-in-adults/index.shtml (last visited Sept. 18, 2015).

Capacity Assessment and completed a Psychiatric Review Technique form. (R. at 210-11, 213-26). He noted that Ms. Belen "allege[d] depression," began treatment in June 2003, had limited social contacts and no friends, but that she cared for three children, shopped, did housework, and used public transportation. (R. at 210A). Her concentration and memory were somewhat impaired, and he found that she was moderately limited in the following areas: ability to complete a normal workday and workweek without interruption from psychologically-based symptoms, ability to interact appropriately with the public, ability to respond appropriately to changes in her work setting, and ability to set realistic goals or make plans independently. (R. at 210A). Dr. Gieseken opined that she had the residual functional capacity to perform "simple task work." (R. at 211). He noted her impairment as depressive disorder, causing mild restriction of activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 216, 223). Consultant psychologist Michael Friedman, Ph.D., agreed with the assessment. (R. at 227-28, 230).

Treating psychiatrist Dr. Berk filled out a Condition Status Report on February 12, 2004, noting Ms. Belen's "non-optimized" bipolar depression and hypothyroidism. (R. at 232). He reported that she was temporarily unemployable and required nine months

8

before she might be able to engage in some work activities.  (R. at 232).

At her annual medical examination in March 2004, Ms. Belen was diagnosed with bipolar disorder, hypothyroidism, generalized arthritic pain, and a fungal infection.  (R. at 335).  Her physical examination was normal, and she was directed to follow up with a psychiatrist and a dermatologist/podiatrist.  (R. at 335).  At an appointment on September 23, 2004, she was prescribed Depakote, Paxil, and the antipsychotic medication Geodon.  (R. at 332).  A progress note dated December 21, 2004, indicates that her medications were Paxil and Abilify, which treats bipolar disorder and depression.  (R. at 329).

On May 5, 2006, Ms. Belen visited Federation Employment and Guidance Service, a health and human services organization also known as FEGS, complaining of depression and anxiety.  (R. at 243).  She reported that she was not on medication.  (R. at 244).  The social worker who examined her diagnosed bipolar disorder and hypothyroidism, and noted that she had been evaluated by a psychiatrist who stated that she could not work for at least three months due to her mental condition.  (R. at 244).  She was referred to psychiatrist Mercedes Brito, M.D., for further treatment.  (R. at 244, 368).

Ms. Belen saw Dr. Brito on June 1, 2006.  (R. at 363-68).  She

9

reported that she had been diagnosed with bipolar disorder but was not currently taking medication, although she had been prescribed Paxil, Depakote, and the bipolar medication Seroquel. (R. at 363). Dr. Brito noted depressed mood, poor insight, and low anger control, and assessed a GAF score of 60. (R. at 365-68, 374). She prescribed Depakote and psychotherapy. (R. at 368). Licensed Certified Social Worker Luz Vargas saw Ms. Belen two weeks later. (R. at 362). Ms. Belen descibed symptoms of anxiety, mood swings, forgetfulness, insomnia, irritability, social withdrawal, and compulsive spending. (R. at 362).

At a June 21, 2006 appointment with Dr. Brito, Ms. Belen complained of insomnia and was diagnosed with dysthymia.[8] (R. at 361). Dr. Brito also noted that bipolar disorder should be considered. (R. at 361). Ms. Belen was prescribed Depakote and Paxil. (R. at 361). A follow-up with Ms. Vargas one week later revealed depressed mood and affect. (R. at 353).

Ms. Vargas saw Ms. Belen again on July 25, 2006, and filled out an Adult Psychosocial Form. (R. at 353-60). Ms Belen had an anxious mood and affect and reported depression, anxiety, panic

---

[8] Dysthymia is a mild but chronic depressive condition. Dysthymia, http://www.mayoclinic.org/dieases-conditions/dysthymia /basics/definition/con-20033879 (last visited Sept. 18, 2015).

10

attacks, sleep disturbances, and somatization.[9]  (R. at 353, 356).
She was diagnosed with dysthymia, dependent personality disorder,
and hypothyroidism, and assessed a GAF of 60.  (R. at 360).  At an
appointment with Dr. Brito the next day, Ms. Belen reported that
Paxil was not helping her panic attacks.  (R. at 352).  Dr. Brito
prescribed Depakote, Paxil, and Ambien.  (R. at 352).

On August 23, 2006, Ms. Vargas filled out a
Psychiatric/Psychological Impairment Questionnaire for Ms. Belen
that was later signed by psychologist Dr. Arthur Berger.  (R. at
261-68).  The diagnoses were dysthymia, bipolar disorder, and
hypothyroidism, supported by clinical findings of sleep
disturbance, mood disturbance, feelings of guilt or worthlessness,
decreased energy, pathological dependence or passivity, and
isolation.  (R. at 261-62).  She had a GAF of 50, and her prognosis
was "not clear."  (R. at 261).  Ms. Vargas found Ms. Belen to be
markedly limited in the following areas: ability to understand,
remember, and carry out both simple and detailed instructions;
ability to maintain attention and concentration for extended
periods; ability to perform activities within a schedule, maintain

---

[9] Somatization, or somatic symptom disorder, "is a long-term
(chronic) condition" in which a person "feels extreme anxiety about
physical symptoms," which "interfere[s] with daily life."  Somatic
Symptom Disorder, https://www.nlm.nih.gov/medlineplus/ency/article/
000955.htm (last visited Sept. 18, 2015).

regular attendance, and be punctual; ability to maintain ordinary routine without supervision; ability to work in coordination or proximity to others; ability to complete a normal work week without interruption from psychological symptoms; ability to interact with the general public; ability to respond appropriately to changes in the workplace; ability to travel to unfamiliar places or used public transportation; and ability to set realistic goals or make plans independently.  (R. at 264-66).  She was moderately limited in her ability to remember locations and work-like procedures, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism, and get along with co-workers without distracting them. (R. at 264-65).  She had mild limitations in her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, as well as her awareness of normal hazards and ability to take appropriate precautions. (R. at 265-66).  Ms. Vargas opined that Ms. Belen was unable to be around people or follow a work routine, was incapable of tolerating even low work stress, and would likely be absent from work because of her impairments more than three times a month.  (R. at 266-68). Ms. Vargas indicated that the impairments were unlikely to last at least twelve months.  (R. at 267).

On August 28, 2006, Ms. Vargas again noted Ms. Belen's

depressed mood and affect; on September 18, 2006, she described Ms. Belen as having a constricted affect and sad and anxious mood.  (R. at 350, 308).  One month later, at a psychiatric follow-up, Dr. Brito noted that Ms. Belen reported feeling better, although her mood was still sad.   (R. at 304).   Dr. Brito diagnosed cyclothymia;[10] prescribed Depakote and the antidepressants Zoloft and Trazadone; and discontinued Ambien.  (R. at 304).  However, on January 4, 2007, Ms. Vargas noted a constricted affect and an anxious, depressed, and sad mood, and diagnosed Ms. Belen with major depression, recurrent psychotic, and assessed a GAF of 45-50. (R. at 303).  At an appointment with Dr. Brito on February 17, 2007, Ms. Belen reported that she had not taken her medications for several months because she was not sure that they helped her condition, and that her son was causing her significant stress. (R. at 299).  Dr. Brito noted a depressed mood and diagnosed dysthymia.  (R. at 299).  Ms. Belen was prescribed Depakote, Zoloft, and Ambien.  (R. at 299).

Following this appointment, Dr. Brito completed a Psychiatric/Psychological Impairment Questionnaire.  (R. at 279-86).  She diagnosed Ms. Belen with major depression, recurrent

---

[10] Cyclothymia is similar to bipolar disorder, but with less extreme ups and downs.  Cyclothymia, http://www.mayoclinic.org/ diseases-conditions/cyclothymia/basics/definition/con-20028763 (last visited Sept. 18, 2015).

psychotic, and assessed a GAF of 45.  (R. at 279).  The diagnosis was supported by clinical findings of poor memory, sleep and mood disturbance, pervasive loss of interest, feelings of guilt and worthlessness, difficulty thinking or concentrating, social withdrawal, flat or inappropriate affect, decreased energy, generalized persistent anxiety, and pathological dependence or passivity.  (R. at 280).  Dr. Brito found Ms. Belen's symptoms consistent with her claimed emotional impairments.  (R. at 281).  Ms. Belen was markedly limited in all areas of understanding and memory, and all areas of sustained concentration and persistence, and markedly or moderately limited in all areas of social interactions and adaptation.  (R. at 282-84).  Dr. Brito stated that the impairments were likely to last for at least twelve months, and that they exacerbated Ms. Belen's low back pain.  (R. at 285).  She also found that Ms. Belen could tolerate a low stress work environment, but that her impairments were likely to cause her to be absent from work more than three times a month.  (R. at 285-86).

Ms. Belen attended psychotherapy appointments with Ms. Vargas on February 22, 2007, March 8, 2007, March 22, 2007, and April 17, 2007.  At each of these appointments, Ms. Vargas noted an anxious, depressed and sad mood.  (R. at 298, 296, 294, 292).  Ms. Belen also suffered from a constricted affect (R. at 298, 296, 292) and,

14

on one occasion, appeared at her appointment poorly groomed (R. at 298).

Consultative psychologist Alan Dubro, Ph.D., evaluated Ms. Belen on March 14, 2007. (R. at 271-77). Ms. Belen reported sleep disturbance and daily anxiety, both of which were somewhat controlled by her medications. (R. at 271-72). Dr. Dubro found that her mental functioning was generally within normal parameters except that her mood was "mildly anxious" and her intellectual functioning and fund of knowledge were limited. (R. at 272-73). He opined that her psychiatric condition, which he diagnosed as anxiety disorder, was, "in itself," not "significant enough to interfere with [her] ability to function on a daily basis." (R. at 273).

Dr. Brito filled out a second Psychiatric/Psychological Impairment Questionnaire in March 2008, noting that she had been treating Ms. Belen since October 2006. (R. at 456). The diagnoses were dysthymia; bipolar affective disorder, depressed, in partial remission; hypothyroidism; low back pain; and high blood pressure. (R. at 456). She assessed a GAF score of 50-55. (R. at 456). Dr. Brito found that Ms. Belen was moderately or markedly limited in all areas of understanding and memory, sustained concentration and persistence, social interactions, and adaptation. (R. at 459-61). Ms. Belen was incapable of tolerating even a low stress work

15

environment, and was likely to be absent from work more than three times per month. (R. at 462-63).

In June 2012, psychologist Howard Tedoff, Ph.D. performed a consultative examination, including an intelligence evaluation. (R. at 660-66). He found that Ms. Belen had mild restrictions in the ability to make judgments on simple work-related decisions and to interact appropriately with the public, and moderate limitations in the ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and changes in routine. (R. at 660-61). He found her full scale IQ to be 70, which placed her in the second percentile. (R. at 665). Dr. Tedoff indicated that her intellectual functioning "range[d] from mildly deficient to average."[11] (R. at 665). Dr. Tedoff noted that Ms. Belen "allege[d] bipolar disorder" and diagnosed her with anxiety disorder, learning disorder, and variably borderline intellectual functioning. (R. at 666). He found that her

---

[11] A full scale IQ of 69 is in the "very low range," <u>Ackernecht v. Commissioner of Social Security</u>, No. 12-CV-601, 2013 WL 5462965, at *7 (N.D.N.Y. Sept. 30, 2013), and a full scale IQ of 66 falls "between the mentally retarded and borderline range of intelligence," <u>Orton v. Astrue</u>, No. 11-CV-630, 2013 WL 3328025, at *3 (N.D.N.Y. July 2, 2013). Ms. Belen's scores for verbal comprehension and perceptual reasoning were 63 and 67, respectively. (R. at 665).

impairments "may interfere with [her] ability to function in the workplace on a daily basis" and assessed the prognosis for her to "look for, obtain and sustain herself in gainful employment" to be "guarded to poor." (R. at 666).

D.   <u>Hearing Testimony</u>

Ms. Belen has testified at four different hearings in this case.

1.   <u>October 20, 2005</u>

At a hearing on October 20, 2005, she testified that she had been seeing a psychiatrist for three years, and had been diagnosed with depression and bipolar disorder. (R. at 519). She described mood swings, forgetfulness, trouble concentrating, insomnia, loss of appetite, anxiety, and irritability. (R. at 522, 526, 528-531). The symptoms were "[s]ometimes" alleviated with medication. (R. at 523-524). She reported that she took care of her children, including picking them up from school, and tried to keep her house clean. (R. at 526, 530).

2.   <u>June 11, 2007</u>

At the June 11, 2007 hearing, Ms. Belen testified that she normally stayed home unless she had an appointment. (R. at 478, 481). She could not take the bus after 3:00 p.m. because "the kids come out at that time" and the noise caused her to have panic attacks. (R. at 478, 482). She cooked and could shop with the

17

help of her children. (R. at 478, 481). She complained of lower back pain, for which she was taking pain medication, and high blood pressure. (R. at 479-80). The medication she took for her psychiatric symptoms made her sleepy. (R. at 480). Her depression caused her to stay in bed approximately three times per week. (R. at 480). She further described trouble concentrating and forgetfulness. (R. at 482-83).

Psychiatrist Peter G. Sack, M.D., testified as a medical expert. (R. at 485-99). He noted that there were conflicts in the record about Ms. Belen's impairment, which had been variously diagnosed as major depressive disorder, recurrent psychotic; dysthymia; cyclothymia; amd bipolar disorder hypomanic. (R. at 486-87). In particular, he noted that the diagnosis of major depressive disorder, recurrent psychotic reflected in Dr. Brito's impairment questionnaire dated February 17, 2007, is not supported in the clinical findings section of that same questionnaire and conflicts with the treatment notes of the same date, which diagnose dysthymia. (R. at 487-88). Similarly, Dr. Sack found no support for Ms. Vargas' diagnosis of psychosis. (R. at 489). Nonetheless, based on Ms. Belen's testimony, he opined that she was unable to work "at the present time" because of "a marked impairment in concentration, and the mood disorder, which she refers to as essentially disabling her three times a week." (R. at 490-91). He

was not able to determine whether the impairment would last for longer than twelve months.  (R. at 495).

Raymond Cestar, a vocational expert, also testified.  (R. at 499-505).  The ALJ presented him with a hypothetical claimant of the same age, education, and work history as Ms. Belen, who was able to perform the full range of light work and was limited to low stress, simple, repetitive tasks.  (R. at 501).  Mr. Cestar found that such a person could be a cafeteria attendant or housekeeper.  (R. at 501).  If the hypothetical claimant could perform only sedentary work, she could be a clerical worker or ticket counter.  (R. at 502).  Ms. Belen's attorney added the limitation that the claimant would be absent from work due to her impairments three of more times a month.  (R. at 503).  In that situation, the plaintiff would not "be able to maintain competitive employment" in any of the proposed jobs.  (R. at 503).

### 3.   July 19, 2012

In a July 19, 2012 hearing, Ms. Belen's impairments were described as major depressive disorder, hyper-manic bipolar affective disorder, and dysthymia.  (R. at 703).  She stated that she got nervous around people and was therefore "very antisocial." (R. at 702).  The hearing was adjourned so that Ms. Belen could undergo a consultative examination.  (R. at 705).

19

4.   October 9, 2012

A follow-up hearing was held on October 9, 2012, after Ms. Belen had been seen by a consultative examiner.   Ms. Belen testified that between 2003 and 2008 she had days when she could not get up from bed to attend her appointments.   (R. at 715-16). Such days occurred three to four times per week.   (R. at 719-20). Although her medications began alleviating her symptoms somewhat in 2006, she still had regular panic attacks.   (R. at 720-21).   The medication also made her sleepy, so that she napped for two to three hours approximately four times per week.   (R. at 721). During the relevant period, Ms. Belen reported that she made her children dinner about four times per week, did laundry, and cleaned her house.   (R. at 723-24).

The ALJ then presented a vocational expert with a hypothetical claimant of Ms. Belen's age, education, and work experience, who also had the following physical limitations.   She could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit with normal breaks for six out of eight work hours; occasionally climb ramps, stairs, ladder, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.   She could not tolerate exposure to noise or bright lights and must avoid machinery and heights.   (R. at 725-26).   In addition, the hypothetical claimant had the following non-exertional limitations.

20

She could perform only simple, routine, and repetitive tasks that could be explained, and which involved making simple decisions only, occasional changes in routine, and occasional and superficial contact with others. (R. at 726). The vocational expert found that a person with those characteristics could perform a number of jobs: ticketer, bagger, and decal applicator. (R. at 726-27). Ms. Belen's attorney added to the hypothetical the following limitations: the claimant could not maintain concentration and attention for extended periods of time, perform activities within a schedule, maintain regular attendance and punctuality, or sustain ordinary routines without supervision. The vocational expert's response was not intelligble. (R. at 728-29). However, when counsel added the limitations that the hypothetical claimant could not complete a normal work week without interruption form psychologically-based symptoms, or be absent from worker fewer than three times a month, the vocational expert testified that such a claimant would be unable to work in the competitive labor environment. (R. at 729).

<u>Analytical Framework</u>

    A. <u>Determination of Disability</u>

    A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009); Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000).

The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i), (b). Second, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(a)(4)(ii), (c). Third, if the impairment is listed in Appendix 1 or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d). Fourth, if the claimant is unable to make

the requisite showing under step three, she must prove that she does not have the residual functional capacity to perform her past work.  20 C.F.R. § 416.920(a)(4)(iv), (e).  Fifth, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.   20 C.F.R. §§ 416.920(a)(4)(v), (g), 416.960(c); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).   In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.   Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

B. Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003

23

WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Hahn, 2009 WL 1490775, at *6 (quoting Bonet v. Astrue, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21

24

(citing <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999), and <u>Williams v. Bowen</u>, 859 F.2d 255, 256 (2d Cir. 1988)).  Substantial evidence in this context is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Hahn</u>, 2009 WL 1490775, at *6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).

<u>Analysis</u>

    A. <u>The ALJ's Decision</u>

ALJ Miller evaluated Ms. Belen's claim pursuant to the five step sequential process and concluded that she was not disabled at any point during the relevant time period.  (R. at 573).

At step one, the ALJ found that Ms. Belen had not engaged in any substantial gainful activity since August 27, 2003, the application date, through November 23, 2008.  (R. at 561).  At step two, he determined that she had the following severe impairments: mood disorders and variably borderline intellectual functioning.  (R. at 561-62).  At step three, however, the ALJ determined that none of Ms. Belen's impairments, either individually or in combination, was of a severity to meet or medically equal one of the "listed impairments" in Appendix 1 of the regulations (the "Listings").  (R. at 562-64).

At step four, the ALJ determined that from August 27, 2003 through November 23, 2008, Ms. Belen had "the residual functional

capacity to perform light work as defined in 20 CFR [§] 416.67(b) except the claimant can occasionally climb ramps and stairs.  She can occasionally climb ladders, ropes and scaffolds.  She can occasionally balance, stoop, kneel, crouch, and crawl." (R. at 564).  He explained that Ms. Belen should avoid concentrated exposure to noise and bright lights and should work in jobs that do not involve hazards, that take into account mental limitations, that allow the performance of simple, routine and repetitive tasks that can be explained, that involve making simple decisions only, and that involve only occasional changes in a routine.  (R. at 564).  Furthermore, he explained that Ms. Belen should be "limited to a job that involves only occasional and superficial contact with others." (R. at 564).

In reaching this conclusion, the ALJ determined that Ms. Belen's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. at 565).

The ALJ assigned "significant but not controlling weight," to the opinions of non-treating sources Dr. Vadeika, Dr. Gieseken, and Dr. Friedman, which were rendered between October 2003 and January 2004.  (R. at 567-68).  He credited these sources to the extent that they "did not claim that the claimant had disabling

limitations," but refused to give their specific opinions regarding
her limitations controlling weight because they "appear to be
somewhat more restrictive than the claimant's own admissions." (R.
at 568).

ALJ Miller assigned "little weight" to the opinion of treating
physician Dr. Berk, who "briefly saw [Ms. Belen] during part of the
relevant period." (R. at 568). He noted that Dr. Berk failed to
check the box on the form indicating that she was permanently
impaired or disabled, but found that Ms. Belen was unemployable for
at least nine months. (R. at 568). However, he refused to credit
even that opinion because Dr. Berk "did [not] provide any
functional impairments or adequately explain why he felt [Ms.
Belen] was disabled." (R. at 568). He further assigned "little
weight" to the opinion of the unidentified source at FEGS that Ms.
Belen could not work because of her mental condition. (R. at 568).
The ALJ found that several characteristics of the opinion
undermined its probative weight: "[I]t is unclear who made the
determination or what it was based on"; it does not provide
functional limitations, and there is no indication that Ms. Belen
had an established treatment history with the organization. (R. at
568). He assigned "little weight" to Ms. Vargas' August 23, 2006
evaluation, later signed by Dr. Berger, which noted that Ms. Belen
had a number of marked impairments. (R. at 568). ALJ Miller noted

27

that roughly contemporaneous treatment notes show poor compliance with therapy and indicate that Ms. Belen was not on any medications, and concluded that the "extreme limitations" are inconsistent with Ms. Belen's bi-monthly therapy appointments, which he characterized as "relatively infrequent care." (R. at 568).

Dr. Brito's opinions, too, were assigned "little weight." The ALJ noted certain inconsistencies between Dr. Brito's treatment notes and her February 17, 2007 Psychiatric/Psychological Impairment Questionnaire, which found Ms. Belen markedly limited in numerous areas. (R. at 568-69). The ALJ described two further disability forms filled out in mid-2008, in which "Dr. Brito stated that [Ms. Belen] did not have an impairment that was ongoing" and did not "fill in a date as to when the impairment started," although one of the forms indicated that Ms. Belen would miss more than three work days in a month.[12] (R. at 569). He also refused to credit Dr. Brito's opinion because Ms. Belen had failed to take medication and failed to see a psychiatrist for a period of months: "[i]t is unclear how the doctor was able to determine the claimant was disabled, when the claimant was not following up with even conservative care and medication management." (R. at 569).

---

[12] These two forms, apparently dated March 18, 2008, and May 18, 2008, do not appear in the Administrative Record.

ALJ Miller assigned "significant weight" to the opinion of consultative examiner Dr. Dubro, who found that Ms. Belen could follow and remember simple instructions and perform simple and complex tasks independently, noting that the opinion "is consistent with the claimant's infrequent treatment, poor treatment compliance[,] [] lack of consistent medications," and her "busy activities of daily living," which included raising three children. (R. at 569).

ALJ Miller did not credit the opinion of medical expert Dr. Sack, who testified at the June 11, 2007 hearing that Ms. Belen was, at that time, unable to work.  (R. at 569).  The ALJ noted that Dr. Sack could not say when Ms. Belen's impairment began or how long it was likely to last.  (R. at 569).  He also discounted the opinion because it was based largely on Ms. Belen's subjective complaints, which "were not consistent with the record."  (R. at 569-70).

The ALJ also addressed opinions of health care professionals that post-date the relevant period.  A January 2009 opinion of Ms. Vargas' that found Ms. Belen incapable of working[13] was assigned little weight because it did not establish Ms. Belen's inability to work during the relevant period.  On the other hand, a January 2009

---

[13] This opinion is not included in the Administrative Record.

opinion from consultative examiner Dr. Hoffman[14] that found Ms. Belen capable of working was assigned significant weight, notwithstanding that the ALJ found that testing that indicated Ms. Belen had "mild mental retardations"; this finding was deemed "inaccurate[]" because Ms. Belen did not follow test directions and was malingering, as evidenced by later intellectual testing showing her full scale IQ as 70.  (R. at 570).  A June 2012 opinion by consultative examiner Dr. Tedoff was determined to be insufficiently probative because it was completed "over ten years [after] her alleged onset date." (R. at 571).  The ALJ noted that, although it was completed after Ms. Belen was found to be disabled, the opinion indicated that she would be capable of working with limitations.  (R. at 571).

At step five, the ALJ found that the plaintiff had no past relevant work experience. (R. at 572).  He found that, considering the plaintiff's residual functional capacity, age, education, and work experience, as well as the testimony of the vocational expert, Ms. Belen was capable of performing various jobs from August 27, 2003, through November 23, 2008, and therefore was not disabled. (R. at 572-73).

---

[14] This opinion is not included in the Administrative Record.

B.   <u>The Commissioner's Motion</u>

The Commissioner recognizes that "[t]he Social Security Act requires the Commissioner to 'file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.'" (Memorandum of Law in Support of the Commissioner's Motion for Remand and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Memo.") at 5 (quoting 42 U.S.C. § 405(g)). She argues that the case must be remanded because "[t]he ALJ who issued the final decision in this case relied on evidence that is not part of the certified administrative record." (Def. Memo. at 5).

"For a district court to remand on the basis of an incomplete administrative record, the Commissioner must give sufficient justification why the records were not previously included in [the] [p]laintiff's administrative file." <u>Kaplan v. Barnhart</u>, No. 01 CV 8438, 2004 WL 528440, at *3 n.2 (E.D.N.Y. Feb. 24, 2004) (citing <u>Balsamo v. Chater</u>, 142 F.3d 75, 82 (2d Cir. 1998)). Here, the Commissioner's only attempt to provide justification is to note that, because Ms. Belen filed a new application for benefits at approximately the same time that she sought court review of the final decision denying her first application, the Commissioner had to "both prepare a record for court review on [the] first application[] and develop the record in connection with [the]

31

second application," which "may have contributed to the ALJ's apparent confusion" in referring to "exhibits in an electronic folder" that were not made part of the certified record. (Def. Memo. at 12). This is no explanation at all. The record that the Commissioner must file is to include all of the evidence upon which the Commissioner relied in her final decision. The defendant does not assert that these missing records were not properly before the ALJ. Thus, it is not clear why the ALJ should be branded as "confus[ed]" (Def. Memo. at 12) because he relied on those records. Indeed, any confusion seems to be on the part of the individuals who compiled the Administrative Record.

Moreover, remand on this basis is inappropriate because the ALJ summarized the missing records in his decision. Therefore, to the extent that they are relevant here, there is a sufficient record on which to base a ruling. In this situation, the Commissioner's argument is an insufficient basis on which to remand the case, and I recommend denying her motion for judgment on the pleadings.

C.   <u>The Plaintiff's Motion</u>

Ms. Belen seeks a remand to the Commissioner solely for the calculation of benefits. She argues that the ALJ failed to weigh the medical evidence properly, refusing to "give any probative weight to the treating sources" and instead "rel[ying] on the

opinions from the consultative examining psychologists and non-examining state agency consultants." (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Memo.") at 18). She also charges the ALJ with improperly evaluating her credibility. (Pl. Memo. at 22). According to her,

> [t]o remand the claim for a fifth hearing before an ALJ after [she] has been waiting over twelve years for a final resolution in her case would be useless given that she has already been found disabled as of November 23, 2008 and no further evidence related to the [period] at issue could be produced.

(Pl. Memo. at 24).

The SSA regulations establish that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)); accord Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010). "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable

to obtain or communicate." <u>Correale-Engelhart</u>, 687 F. Supp. 2d at
426 (quoting 20 C.F.R. § 416.927(d)(2)).  In considering a treating
source's opinion, "the ALJ cannot arbitrarily substitute his own
judgment for competent medical opinion." <u>Rosa v. Callahan</u>, 168
F.3d 72, 79 (2d Cir. 1999) (quoting <u>McBrayer v. Secretary of Health
and Human Services</u>, 712 F.2d 795, 799 (2d Cir. 1983)); <u>see also</u>
<u>Wagner v. Secretary of Health and Human Services</u>, 906 F.2d 856, 862
(2d Cir. 1990) (noting that "a circumstantial critique by non-
physicians . . . must be overwhelmingly compelling in order to
overcome a medical opinion").  However, determination of
"dispositive" issues, such as whether the plaintiff "meet[s] the
statutory definition of disability" and cannot work, are reserved
for the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1);
<u>see</u> <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999).

     The ALJ is not required to give the treating source's opinion
controlling weight, but he is required to give "good reasons" for
the weight he does assign to the opinion.  20 C.F.R.
§ 404.1527(c)(2); <u>see</u> <u>Snell</u>, 177 F.3d at 134 ("The requirement of
reason-giving exists, in part, to let claimants understand the
disposition of their cases . . . . [A claimant] is entitled to be
told why the Commissioner has decided -- as under appropriate
circumstances is his right -- to disagree with [the treating
physician]."). If the ALJ determines that a treating physician's

opinion is not controlling, he is required to consider the following factors in determining the weight to be given to that opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the relationship; (3) the evidence provided to support the physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.   20 C.F.R. § 404.1527(c); see Halloran, 362 F.3d at 32.   Although the ALJ need not explicitly discuss the factors, the decision must clearly demonstrate that he properly applied the required analysis.   Khan, 2013 WL 3938242, at *15 (citing Petrie, 412 F. App'x at 406).

When the ALJ does not "comprehensively set forth reasons for the weight assigned" to a treating source's opinion, courts "do not hesitate to remand." Halloran, 362 F. 3d at 33.   Furthermore, "the treating physician rule is particularly important in the context of mental health" because mental impairments are generally difficult to diagnose without "subjective, in-person examination." Canales, 698 F. Supp. 2d at 342 (quoting Richardson v. Astrue, No. 09 Civ. 1841, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009)); see also Rodriquez v. Astrue, No. 07 Civ. 534, 2009 WL 637154, at *26 (S.D.N.Y. March 9, 2009) ("The mandate of the treating-physician

rule to give greater weight to the opinions of doctors who have a
relationship with a plaintiff is particularly important in the
mental-health context.").

As noted, the ALJ failed to give controlling weight to the
opinions of Dr. Brito, stating that they "are not consistent with
her own treatment notes." (R. at 569). He wondered how the
treating physician could determine in her February 2007 opinion
form that Ms. Belen was disabled when "the claimant was not
following up with even conservative care and medication
management." (R. at 569). There is no mention of how the length
of Ms. Belen's treatment relationship with Dr. Brito, which seems
to have begun in 2006, affected the weight assigned to her
opinions. Moreover, the ALJ fails to note that, while she had not
seen Dr. Brito in four months, Ms. Belen had recently seen her
therapist, Ms. Vargas. (R. at 424). Nor did the ALJ note that
there is evidence in the record that Ms. Belen was taking
medications for her psychiatric impairments. (R. at 284, 301,
304). In short, the ALJ failed to "comprehensively" set forth his
reasons for not giving Ms. Belen's treating psychiatrist's opinion
controlling weight.

The ALJ similarly cites Ms. Belen's lack of compliance as a
reason to discount the opinions of Ms. Vargas. (R. at 568). To be
sure, as a therapist, Ms. Vargas is not an "acceptable medical

source" under the regulations.  See 20 C.F.R. § 404.1513(a).  She is, however, an "other source," whose "special knowledge of the individual [] may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Social Security Ruling 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006).  In evaluating opinions from medical sources who are not "acceptable medical sources," the ALJ should consider factors similar to those that apply to the evaluation of the opinions of acceptable medical sources, and should explain the reasons informing his analysis of the course.  Id. at *4-6.  As Ms. Belen notes, there is no indication that ALJ Miller evaluated any of these factors in rejecting Ms. Vargas' opinion.  (Pl. Memo. at 21).

Indeed, the ALJ's superficial analysis of Ms. Belen's non-compliance with treatment in connection with his evaluation of both Dr. Brito's and Ms. Vargas' opinions is particularly disquieting given that in the most recent remand order, Judge Gardephe specifically directed the ALJ to "follow the standards set forth in [Social Security Ruling] 82-59 when considering [Ms.] Belen's refusal to follow prescribed treatment."  Belen, 2011 WL 2748687, at *13.  Under that ruling, in order to be denied benefits on the basis of non-compliance, a claimant must "fail" each part of "threefold test": "(1) the treatment must be prescribed by a

37

treating physician; (2) such treatment must, according to the SSA, restore [her] ability to work; (3) [she] must have no justifiable cause to refuse treatment." Id. (quoting Benedict v. Heckler, 593 F. Supp 755, 759 (E.D.N.Y. 1984). Such an analysis may be most useful when evaluating the claim of an individual, like Ms. Belen, who suffers from psychological difficulties that apparently make it difficult for her to attend treatment appointments. See, e.g., Thompson v. Apfel, 97 Civ. 7697, 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998) ("A claimant . . . who suffers from psychological and emotional difficulties may lack the rationality to decide whether to continue treatment or medication.").

Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding the case for a rehearing. Remand solely for a calculation of benefits is appropriate where the record before the court "compel[s] but one conclusion under the treating physician rule and the substantial evidence standard." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). Here, however, "there are . . . portions of the record which cast doubt on the merits of [Ms.] Belen's claim." Belen, 2011 WL 2748687, at *11 n.12. Remand for a rehearing so that the ALJ can properly evaluate the medical

38

evidence is therefore warranted.[15]   Rosa, 168 F.3d at 82-83
(rehearing appropriate where ALJ applied improper legal standard).
On remand, the ALJ will, of course, re-evaluate Ms. Belen's
credibility, taking care to explain the assessment with specific
reasons. See Garner v. Colvin, No. 13 Civ. 4358, 2014 WL 2936018,
at *10-11 (S.D.N.Y. June 27, 2014) (because claimant's "credibility
can only be properly assessed after the correct application of the
treating physician rule," the issue must be "revisited on remand");
Tornatore v. Barnhart, No. 05 Civ. 6858, 2006 WL 3714649, at *5-6
(S.D.N.Y. Dec. 12, 2006).

Conclusion

   For the foregoing reasons, I recommend that the plaintiff's
motion for judgment on the pleadings (Docket no. 14) be denied, the
Commissioner's cross-motion (Docket no. 16) be denied, the
Commissioner's decision denying benefits be vacated, and the case
be remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g)
for further administrative proceedings.   Pursuant to 28 U.S.C. §
636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of

---

   [15] I understand Ms. Belen's frustration at the course of this
litigation.   However, the Second Circuit has held that "absent a
finding that the claimant was actually disabled, delay alone is an
insufficient basis on which to remand for benefits."   Bush v.
Shalala, 94 F.3d 40, 46 (2d Cir. 1996).   But, "[g]iven the length
of time this case has been pending," I recommend that the Court
"direct[] the Commissioner to begin the remand process forthwith."
Kaplan, 2004 WL 528440, at *3.

Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Paul G. Gardephe, Room 706, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       September 23, 2015

Copies transmitted this date:

Charles E. Binder, Esq.
Binder & Binder P.C.
60 E. 42nd St., Suite 520
New York, NY 10165

Susan G. Baird, Esq.
Assistant U.S. Attorney
86 Chambers St., 3rd Floor
New York, NY 10007